2L 425
6L 731
6L 736
6L 744
6L 751
8L 597
10L 481
12L 257
15L 637
16L 536
3pi 215
4pi 141

2L 425
116   43
116  480
f116  749

## HENRY LUEHRMAN *v.* TAXING DISTRICT OF SHELBY COUNTY and others.

1. CONSTITUTIONAL LAW. *Title. Subject matter.* Under a provision of the Constitution of the State, that "No bill shall become a law which embraces more than one subject, that subject to be expressed in the title," an act entitled "An act to repeal the charter of certain municipal corporations and to remand the territory and inhabitants thereof to the government of the State," is not rendered unconstitutional by a provision that the property used by such corporation for municipal purposes is transferred to the custody and control of the State, to remain public property for the uses to which it has been hitherto applied.

2. SAME. *Same. Same.* Under the same constitutional provision, an act entitled "A bill to establish Taxing Districts in this State and to provide the means of local government for the same," which grants municipal franchises to the communities within the territorial limits of the Taxing Districts, and gives to the corporation thus created all the necessary legislative, judicial and police powers of an incorporated city, and contains specifications of offenses against the corporation or committed by its officials, with penalties and punishments, contains only one subject within the meaning of the Constitution.

3. SAME. *Municipal Corporations. Legislative power to abolish.* Municipal corporations are within the absolute control of the Legislature, and may be abolished at any time in its discretion, and an act which repeals the charter of a single municipal corporation is constitutional.

4. TAXING DISTRICTS. *Municipal Corporations.* An act which grants municipal franchises to the communities within the territorial limits of certain districts, in order to provide the means of local government, and creates the "agencies and governing instrumentalities" of a municipal corporation, with the usual legislative, executive and judicial powers, although it may style the creations "Taxing Districts," in reality organizes the people and territory of the district into municipal corporations.

5. CONSTITUTIONAL LAW. *General Law.* An act which provides "that the several communities embraced in the territorial limits of all such municipal corporations in the State as have had or may have their charters abolished, or as may surrender the same under the provisions

of the act, are hereby created Taxing Districts, in order to provide the means of local government for the peace and safety and general welfare of such district,' and further provides for the surrender of all charters of municipal corporations in the State, to enable the communities within their limits to be governed by the new act, is in form a general law, and cannot be held to be intended as a special law, even if the courts can inquire into the intention of the Legislature, although mainly framed or designed for a particular locality, where the acts of the same session of the Legislature show a repeal of thirty-seven municipal corporations, all of whose communities fall at once within the provisions of the act.

6. SAME. *Taxing Districts.* *Legislative power to create.* The act creating Taxing Districts, confers the legislative power of the new municipal government upon a legislative council, consisting of three commissioners and five supervisors, three of which officials are to be appointed by the Governor with the consent of the Senate, one by the Quarterly Court, and four to be elected by the qualified voters of the district, all to hold office for two years, and after the expiration of the first term, to be elected by the qualified voters of the district. Held, that the first appointments were provisional and within the competency of the Legislature, and that the permanent organization was entirely free from constitutional objection.

7. MUNICIPAL CORPORATION. *Taxation.* *Legislative power.* In this State the Legislature may reserve to itself the right to directly impose the necessary taxes for the support of municipal corporations.

---

FROM SHELBY.

---

Appeal in error from the Circuit Court of Shelby county. J. O. PIERCE, J.

L. B. HORRIGAN, W. M. RANDOLPH, D. E. MYERS and O. YERGER for Luehrman *et als.*

C. W. HEISKELL, GANTT & PATTERSON, MCKISICK & TURLEY, and ESTES & ELLETT for Taxing District.

COOPER, J., delivered the opinion of the court.

The decision of this case turns upon the constitutionality of the act of the Legislature repealing the

charter of the City of Memphis, (1879, ch. 10), the act to establish Taxing Districts, (1879, ch. 11), and the act amendatory thereof, (1879, ch. 84).

The first objection urged against them is, that they violate the following prohibition of the Constitution: "No bill shall become a law which embraces more than one subject, that subject to be expressed in the title." The objection is, that each of the first two acts embraces more than one subject. The title of chapter 10 is: "An act to repeal the charter of certain municipal corporations, and to remand the territory and inhabitants thereof to the government of the State." The objection seems to be that while the subject of the title and of the act is the repeal of certain municipal charters, the fourth section of the act provides that the public buildings, squares, etc., "and all other property, real and personal, hitherto used by such corporations for municipal purposes, are hereby transferred to the custody and control of the State, to remain public property as it has always been, for the uses to which said property has been hitherto applied." The title of chapter 11 is: "A bill to establish Taxing Districts in this State, and to provide the means of local government for the same." The objection is, that while the subject of the act is that of the title, it embraces many details, such as the conferring judicial powers on the executive officers of the corporation, and making certain official delinquencies felonies, which, while germane to the object of the act, are, it is said, independent subjects.

Under a similar provision in the Constitution of

·other States to the one quoted, it has been uniformly
held, that only the general or ultimate object of the
act· need be stated in the title, and not the details by
which that object is to be attained.    Dillon's Mun.
Cor., § 28, and cases cited.    "There has been a gen-
·eral disposition," says Mr. Cooley, citing a large num-
ber of· cases, "to construe the constitutional provision
liberally, rather than to embarrass legislation by a con-
struction whose strictness is unnecessary to the accom-
plishment of the beneficial purposes for which it has
been adopted."    Const. Lim., 146.    And Nicholson,
·C. J., after stating and considering those purposes, an-
nounced, as the conclusion of this court, that "any
provision of an act directly. or indirectly relating to
the subject expressed in the title, having a natural
connection therewith, and· not foreign thereto, should
be held to be embraced in it.    This court, thereupon,
held that a provision for a tax on privileges was prop-
erly included in an act entitled "An act to fix the
State tax on property."    Cannon v. Mathes, 8 Heis.,
504, 523.    Upon like grounds a provision for the or-
ganization and sitting of courts in new counties, was
held to be properly embraced in an act, entitled "An
act to authorize the formation of new counties and to
·change county boundaries."    Brandon v. State, 16 Ind.,
197.    And an act entitled "An act for revising and
consolidating the laws incorporating the city of Du-
buque, and to establish a city court therein," was held
to express only one object by its title, which was the
revising and consolidating the laws incorporating the
·city, the court adding that the city court, not being·

an unusual tribunal in such a municipality, might be provided by the act, whether mentioned in the title or not. *Davis* v. *Woolreugh,* 9 Iowa, 104. "We think it plain," says Folger, J., "that an act creating a municipal corporation, and giving it the necessary legislative, taxing, judicial and police powers, embraces but one subject." *Harris* v. *People,* 50 N. Y., 601. And see to the same effect, *Village of Gloversville* v. *Howell,* 70 N. Y., 290, which was a suit for the recovery of penalties under "An act to reorganize the village of Gloversville." The rule of construction upon which these decisions are based, is so obviously the dictate of good sense, that it has been adopted with entire unanimity by courts and text-writers. And under the peculiar wording of our Constitution, which has been held to render the act void *in toto* where more than one subject is embraced in it, although only one is expressed in the title, a strict construction, as to the correctness of which I entertain grave doubts, it becomes very important to adhere to the suggestions of Judge Cooley, which are quoted with approbation by Chief Justice Nicholson, in 8 Heis., 519. "The generality of a title," says that eminent judge and writer, "is no objection to it so long as it is not made a cover to legislation, incongruous in itself, and which by no fair intendment can be considered as having a necessary or proper connection. The Legislature must determine for itself how broad and comprehensive shall be the object of a statute, and how much particularity shall be employed in the title in defining it."

Tested by these rules, it is clear that the provis-

ion touching the property of the corporation whose charter was repealed, in the first of the acts under consideration, was not an independent subject, and was properly embraced in the act. For, it was not so much the enactment of a positive provision, as the enunciation of a legal result of the repeal. Dill. Mun. Cor., § 30; *Terrett* v. *Taylor*, 9 Cranch, 43; and see what Cooley, J., says on this point in *People* v. *Hurlburt*, 24 Mich., 44. It related indirectly certainly, and perhaps we might say directly, to the subject of the act. And the same may be said, with even more certainty, of the details of the second act, all of which are, " directly or indirectly," connected with the local government, the creation of which was the subject thereof. The Constitution, it may be added, provides that " the Legislature may also vest such jurisdiction in corporation courts as may be deemed necessary." Art. 6, § 1. And judicial duties, it is well settled, may be added to those proper to the office of mayor, recorder, or other executive of a municipal corporation. Dill. Mun. Corp., § 147; *Trigally* v. *Memphis*, 6 Col., 382.

Another objection to these acts is, that they were special, relating exclusively to the corporation of Memphis, not general, and therefore violative of another provision of the Constitution. " No corporation shall be created, or its powers increased or diminished by special laws; but the General Assembly shall provide, by general laws, for the organization of all corporations hereafter created, which laws may, at any time, be altered or repealed; and no such alteration or repeal shall interfere with or divest rights which have

become vested." Const., art. 11, § 8.　There can be no doubt that the . repealing act was directed, and exclusively applied to the corporation of the city of Memphis, and just as little doubt that the main object of the other act was to furnish a new charter for the inhabitants of the territorial limits of that city.

If the question were a new one, I would be inclined to hold, that the section of the Constitution just cited was intended only as a restriction upon the legislative powers over private corporations. The weight of judicial authority has been, however, to treat words in a Constitution relating to corporations generally, such as "corporate powers," "body politic or corporate," and "charters of incorporation," as applying equally to public and private corporations. *Purdy* v. *People*, 4 Hill, 384, overruling 2 Hill, 31; *Atkinson* v. *Railroad Company*, 15 Ohio St., 21; *State* v. *Cincinnati*, 20 Ohio St., 18; *Archison* v. *Bartholew*, 4 Kans., 124; *Mayor of Morristown* v. *Shelton*, 1 Head, 24. It seems, also, that the journals of the constitutional convention of 1870 contain evidence that a motion to limit the provisions of the section, above quoted, to private corporations, was voted down. Under these circumstances, although the history of the corresponding section in the previous Constitution of 1834, and the peculiar wording and context of the clause in question leave little doubt in my mind that only private corporations were intended, I will examine the objection made, upon the concession that public corporations are included.

The prohibition of the Constitution is against the

creation or the increase or diminution of the powers of a corporation by special law, and the direction is to provide by general laws "for the organization of all corporations hereafter created." The repeal of a general law, passed in accordance with this requirement, would, necessarily, affect all corporations organized under it. But the intention, so far as appears, was not to interfere with existing public corporations, however diverse might be the provisions of their respective charters. The powers of such corporations could not, it may be, be increased or diminished except by a general law, while there is nothing to prevent the repeal of an existing charter by special law, with a view to the reorganization of the corporate community under a general law. In no other way could the old charters be changed, except indeed by an indiscriminate repeal, a sweeping innovation certainly not expressed, and which the courts are not called upon to imply. The Legislature might have enacted, after the adoption of the new Constitution, a general law, as has been done in regard to private corporations, for the organization of public corporations, and either not interfere with pre-existing charters, or only repeal such of them as chose to organize under the new act. And I am not prepared to hold that there is anything in the language of the Constitution which prohibits the Legislature from repealing, at any time, the corporate privileges of a particular community, whether organized previous or subsequent to the adoption of the Constitution. This is a power so essential to sovereignty and the preservation by the State of its control over its instrumentalities of local rule, that it cannot well

be considered as cut off except by a positive provision to that effect. The restriction is against the powers of a corporation being "diminished" by special laws, not against their entire abolishment. And we may conceive of cases where, by the vicissitudes of trade, as in the case of old Sarum in England, and some of the mining towns of California, the special repeal of a particular charter might be demanded by public policy, when a general repeal would be a remedy worse than the disease.

All the authorities are agreed that municipal corporations are within the absolute control of the Legislature, and may be abolished at any time in its discretion. Dill. Mun. Corp., §§ 30, 37, and cases cited. The reason is obvious. Being created as instrumentalities or arms of the government, they cannot be continued in that capacity whenever the public exigency, of which the Legislature alone is judge, demands that they should cease to act. "It is an unsound and even absurd proposition that political power conferred by the Legislature can become a vested right as against the government, in any body of men." Per Nelson, J., in *People* v. *Morris*, 13 Wend., 331. "Municipal grants of franchise," this court has said, "are always subject to the control of the legislative power for the purposes of amendment, modification, or entire revocation." *City of Memphis* v. *Memphis Water Works*, 5 Heis., 495, 527. See to the same effect, *Governor* v. *McEwen*, 5 Hum., 241; *McCullie* v. *Mayor of Chattanooga*, 3 Head, 317; *Lynch* v. *Lafland*, 4 Col., 96. There cannot be a doubt, therefore, that the act of 1879, ch.

28—VOL. 2.

10, to repeal the charters of certain municipal corporations is constitutional, and that the charter of the city of Memphis is, thereby, repealed.

The act of 1879, ch. 11, to establish Taxing Districts, and the act amendatory thereof, are grants of municipal franchises to the communities within the territorial limits of the Taxing Districts, in order to provide the means of local government. They create the "agencies and governing instrumentalities" of a municipal corporation, with the usual legislative, executive and judicial powers. The local government is clothed with all the authority, and is manifestly intended to answer the purposes of a municipal body. In fine, the Taxing Districts are municipal corporations. The change of name cannot alter the substance. The law looks to facts, not words. And precisely as it can make no difference whether a mountain burgh is called a city, a town, or a village, so it is immaterial whether an incorporated municipality is called by a designated name or nominated a Taxing District. The people and territory of the city of Memphis, whose charter has been repealed, are on the same day re-incorporated as a municipal corporation. They have organized under the new act. If that act is not a general law, within the meaning of the Constitution, it is void.

The first section of the act provides: "That the several communities embraced in the territorial limits of all such municipal corporations in this State as have had, or may have their charters abolished, or as may surrender the same under the provisions of this act,

are hereby created Taxing Districts, in order to provide the means of local government for the peace, safety and general welfare of such districts." Moreover, provision is expressly made, by section 22, for the surrender of all charters of municipal corporations having a population of less than thirty-five thousand inhabitants according to the Federal census of 1870, and to enable the communities within the limits, or under the government of such surrendered corporations, to be governed by the provisions of the new act. And during the legislative session at which the act was passed, the Legislature repealed the charters of thirty-seven municipal corporations, all of whose communities fell at once within the provisions of this act. In form, the act is clearly a general law. And if it be conceded that the court can go behind the form and determine, upon conjecture as to the motive of the Legislature, or upon extrinsic evidence, whether the act is general or special, and to declare it unconstitutional if satisfied that it was in fact intended only for a particlar community, it is clear, in view of the facts of public history, of which the court is compelled to take judicial notice, that no such case is made by this record. The act does provide, by a general law in form, for the organization into municipal corporations of all communities, heretofore otherwise incorporated, who may be brought by a repeal of their charters, or who may bring themselves by a surrender of their charters, under its provisions. It is impossible, in view of these facts, to treat the act as in violation of the prohibition of the organic law.

Another objection urged against the Taxing District acts is, that the municipalities thereby created are so different, in some essential particulars, from those heretofore in existence in this State, and so contrary to the principles of local self-government, and the spirit of our republican institutions, that the acts must be pronounced invalid. The principal points dwelt upon are the mode of appointing the governing body and the limitation of the taxing power.

The history of municipal corporations in this and the mother country discloses quite a diversity of forms in their organization. The governing body has been single, double and even triple, and consisted of many or few members. It has sometimes been appointed by the crown or the Legislature, sometimes elected by the corporators under a more or less extended elective franchise, sometimes having power to fill its own vacancies, and sometimes being hereditary. Dill. Mun. Corp., §§ 8, 16. It is matter of common notoriety that the Mayor of New York continued to be appointed by the Governor of the State long after the revolution, and the adoption of our present national Constitution. And we know, from our statute books, that in this State, until a comparatively recent period, there was a property qualification required, in many instances, for the voters or the officers, or both. Manifestly, the form of organization, in the absence of any constitutional restraint or direction, cannot be material. And the workings of municipalities in this country under existing forms have not been so eminently successful as to render all change undesirable. It would

never do to treat them as clothed with cast-iron inflexibility, unless compelled to do so by positive constitutional provision.    There should be left an opening for improvement through the statesmanship, or even experiments of our law-makers.

The government of incorporated towns has been based upon the idea of local self-government by popular representation, its prototype being the form of the State government.    Several of the State Constitutions, in order to secure the permanency of the form, have expressly provided that the filling of the municipal offices, either by election or appointment, shall belong to the local authority.    *People* v. *Hurlburt,* 24 Mich., 44; *Metropolitan Board of Health* v. *Heister,* 37 N. Y., 661; *Speed* v. *Crawford,* 3 Met., 207; *People* v. *Chicago,* 51 Ill., 17.    Even in these States, the provision of the Constitution is held to apply only to officers whose duties are plainly and exclusively local, and does not extend to officers whose duties concern the State at large or the general public, although exercised within the bounds of the municipality, such as offiers of police, of health, of schools, and for the administration of justice.    A board of police, it has been repeatedly held, may be appointed by the State, without reference to the wishes of the corporation, with powers to estimate the expense of the police, and to compel the city authorities to raise, by taxation, the amount so estimated.    *People* v. *Draper,* 15 N. Y., 532; *People* v. *Metropolitan Police Board,* 16 N. Y., 188; *Baltimore* v. *Board of Police,* 15 Md., 376; *Police Commissioners* v. *Louisville,* 3 Bush, 597; *People* v. *Mahoney,* 13 Mich.,

481; *Diamond* v. *Cain*, 21 La. Ann., 209. These cases are instructive in showing the necessity of the government of the State intervening for the protection of the local communities against the oppression and inefficiency of their own servants, and how impolitic it may sometimes be to hamper legislative action by constitutional restraints. In the absence of such restraints, and our Constitution contains none, the maxim of republican government that local affairs should be managed in the local district is subject, all the authorities agree, to such exceptions as the legislative power shall see fit to make. The Legislature has the power to do whatever is not expressly, or by necessary implication, forbidden by the Constitution. *City of Memphis* v. *Memphis Water Works*, 5 Heis., 529; *Hope* v. *Deaderick*, 8 Hum., 9; *Bell* v. *Bank of Nashville*, Peck, 269; *Knoxville & Ohio R. R. Co.* v. *Hicks*, 1 Tenn. Leg. Rep., 338. It is for that body to determine, as the direct representative of the people, what the public good requires. The courts can only interfere when the Legislature has violated the Constitution, not otherwise. "The courts are not at liberty," says Mr. Cooley, "to declare an act void because it is, in their opinion, opposed to a spirit supposed to pervade the Constitution, but not expressed in words." Const. Lim., 171, citing *People* v. *Fisher*, 24 Wend, 220; *Cochran* v. *Van Surlay*, 20 Wend., 381; *Vynehamer* v. *People*, 13 Wend., 391, 453, 477; *People* v. *Gallagher*, 4 Mich., 244. That is a *spirit* which it is difficult satisfactorily to materialize, even by the most skillful judicial expert. Whenever the Legislature, fresh from.

the people with an unlimited elective franchise, departs from democratic usage, the public exigency must be great which demands so unusual a remedy. The courts have no right to interfere, unless there has been a violation of the organic law.

The act of 1879, ch. 11, confers the legislative power of the new municipal government, designated the Taxing District, upon a "legislative council," consisting of Commissioners of the Fire and Police Board, three in number, and the Supervisors of the Board of Public Works, five in number, and clothes one of the commissioners with the necessary executive and judicial authority. Two of the commissioners are appointed by the Governor, with the consent of the Senate, and the third is elected by the qualified voters of the Taxing District. One of the supervisors is appointed by the Governor, with the consent and advice of the Senate, one by the quarterly court, and the other three are elected by the qualified voters of the Taxing District. All of the commissioners and supervisors hold office for two years, and at the expiration of the first term, are all to be elected by the qualified voters of the corporation. It will thus be seen that for the first two years, the people of the district elect one-half of the governing body directly, and have a will indirectly in the appointment of the other half through the Governor, the members of the Legislature and the justices of the quarterly court, all of whom are elected by the people. The election of all officers, it should be borne in mind, and the filling of all vacancies, not otherwise directed or provided

by the Constitution, are expressly entrusted to the direction of the Legislature. Const., art. 7, sec. 4. And the power may be delegated to the county court in the case of county officers. Const., art. 11, sec. 17. After the first two years, the people elect the entire governing body directly, vacancies alone being filled by the quarterly court. At most, the departure from democratic usage is only partial and limited to a period of two years.

Even if all of the governing body had been appointed by the Legislature, or the Governor with the consent of the Senate, or by the county court, the popular representation in the election of the appointing power would perhaps have been sufficient to meet the requirements of our republican institutions, in the absence of express constitutional directions to the contrary. It has been so held by some courts. *People* v. *Mahaney*, 13 Mich., 500. A *fortiori*, where one-half of the governing body is elected by the people, and the other half appointed by the people's servants.

But the appointment of one-half of the governing body is expressly temporary and provisional. At the expiration of the first term all of the members are to be elected by the people. The question is therefore narrowed down to this: does the provisional organization of a municipal corporation, in a mode not admissible as a permanent form, render the act creating the corporation void? Thus put, there can be only one answer. Our own statutes contain numerous instances where public corporations, counties and towns have been organized and put into operation by commission-

ers appointed by the Legislature or the Governor. And Judge Cooley, in a well-considered case, while expressing a doubt whether the Legislature could constitutionally appoint for a municipal corporation in his State, where the Constitution contained express provision for their local appointment, officers' whose duties were exclusively local, such as a board of water or sewer commissioners, yet held that it was entirely competent for that body to make provisional appointment of such commissioners to put the new system in motion. "It corresponds," he says, "to the authority which constitutional conventions sometimes find it needful to exercise, when they prescribe the agencies by means of which the new constitution they adopt is to be made to displace the old." *People* v. *Hurlburt*, 24 Mich., 44.

The provisional term of two years cannot be deemed unreasonable in this instance, in view of the direct popular representation in the provisional body. Conceding, then, that it may admit of doubt whether the Legislature could permanently appoint, under our Constitution and the democratic character of our institutions, the officers and governing body of a municipal corporation, its right to make provisional appointments is beyond doubt. The appointments in controversy are therefore within the competency of the Legislature.

Another objection is to that part of the act which provides for taxation within the Taxing Districts. The second section of the act provides that "the necessary taxes for the support of the government thus established shall be imposed directly by the General As-

sembly of the State of Tennessee, and not otherwise."
It is said that taxation is indispensable to the existence of a municipal corporation, and, inasmuch as taxation and representation should go together, the taxes should be levied by the corporation itself. But the power of the Legislature to fix the rate of taxation is universally conceded, and its power to compel the levy by the corporate authorities of taxes to meet assessments made by a board of police, has, as we have seen, been directly adjudged in several of the States. So, the right of the State to impose directly local taxation for public instruction, public highways and the public health, is generally conceded. Cooley on Taxation, 478. So, a direct levy by the State has been sustained to meet a corporate obligation. *Dunovan* v. *Green*, 57 Ill., 63. And see *Darlington* v. *New York*, 31 N. Y., 364, and *Sinton* v. *Ashbury*, 41 Cal., 525. "And speaking generally," says Mr. Cooley, "it may be affirmed that in any case in which compulsory taxation is found necessary, in order to compel a municipal or political subdivision of the State to perform properly or justly any of its duties as an agency in the government, or to fulfill any obligation legally or equitably resting upon it in consequence of any corporate action, the State has ample power to direct and levy such compulsory taxation, and the people to be taxed have no absolute right to a voice in determining whether it shall be levied, except as they may be heard through their representatives in the Legislature of the State." Cooley on Taxation, 480. The same writer says elsewhere: "The applica-

tion of the maxim that taxation and representation are inseparable, in a particular case, and the determination how far it can properly and justly be made to yield to considerations of policy and expediency, must rest exclusively with the law-making power, in the absence of any definite constitutional provisions so embodying the maxim as to make it a limitation on legislative authority." Cooley Const. Lim., 170. "It is also a maxim of republican government," he adds, "that local concerns shall be managed in the local district, which shall choose their own administrative and police officers, and establish for themselves police regulations; but this maxim is subject to such exceptions as the legislative power of the State shall see fit to make; and when made, it must be presumed that the public interest, convenience and protection are subserved thereby." Id.

Whatever difficulty may exist in other States as to the power of the Legislature to directly levy local taxes, there can be none in this State. Previous to the adoption of the Constitution of 1834, the doubt was only as to the power of the Legislature to delegate to local authorities the right to tax. *Marr* v. *Enloe*, 4 Yer., 454. "That the taxing power," it was said in that case, "belongs to the Legislature, and *that* exclusively, is a truism never doubted or denied in Tennessee." "The taxing power," this court has often said, "is essentially legislative, and incapable of delegation to other than counties or incorporated towns." *Keesee* v. *Civil District Board*, 6 Cold., 127; *Waterhouse* v. *The Board, &c.*, 8 Heisk., 857. "The

power to levy and collect taxes," this court has quite recently said, "is by our Constitution expressly delegated to the Legislature, and the right to redelegate this authority must be found in the Constitution itself, or it does not exist." *Lipscomb* v. *Dean*, 1 Lea, 550. All of these cases concede that the only authority in the Constitution to redelegate is to be found in art. 2, sec. 29: "The General Assembly shall have power to authorize the several counties and incorporated towns in this State to impose taxes for county and corporation purposes respectively, in such manner as shall be prescribed by law." In the absence of all decision on the subject, the power to delegate would necessarily imply the possession of that power by the body which delegates it. And how the authority to delegate an essentially legislative power can deprive the Legislature of that power, it is difficult, if not impossible, to conceive. Such a result cannot be deduced by any rule of logic, or natural reason.

If, therefore, local powers of taxation come only from the Legislature by delegation, it necessarily follows, as a corollary, that the Legislature may at pleasure, whenever in its opinion the public exigency requires, withhold the grant, and exercise the power itself. There is nothing in the Constitution which prevents this result. Although municipal corporations existed at the adoption of the Constitution, and are recognized by it, yet no provision is made for securing their existence, or perpetuating any of their forms or rights, as in the case of the county courts. *Pope* v. *Phifer*, 3 Heisk., 682. On the contrary, municipal

corporations were, at and before that time, as they have always been, subject to the absolute control of the Legislature. Instead of throwing any restraint over the exercise of this unlimited power, the Constitution, by art. 11, sec. 8, expressly says that the General Assembly may provide, by general laws, for their organization, "which laws may at any time be altered or repealed."

Lastly, that the Legislature may fix the rate and amount of municipal taxation is universally conceded, and the difference between that and what has been done in this case, is more a difference of form than substance. *United States* v. *Burlington,* 2 Am. Law Reg., 394, an opinion of Mr. Justice Miller.

The effect of what has been done on the rights of creditors is not before us, and no opinion is expressed. We merely hold that the previous charters of the city of Memphis have been validly repealed, and that the same people and the same territory have been constitutionally reincorporated under a general law providing for the organization of municipal corporations.

The judgment below being in accordance with these views, is affirmed.

DEADERICK, C. J., and McFARLAND, J., concurred.

COOPER, J., adds:

This opinion disposes also of the cases of *Briggs* v. *Taxing District and others,* and *Goodwin & Co.* v. *Fleece and others,* affirming the judgment of the court below in each.

TURNEY, J., delivered a dissenting opinion:

On 29th January, 1879, the Legislature passed an act entitled "An Act to repeal the charters of certain municipal corporations, and to remand the territory and inhabitants thereof to the government of the State." The first section repeals all laws and parts of laws that in any way pertain to enlarge, diminish or amend the charter of the city of Memphis. By this section reference is had to no other corporation; each of the acts repealed has reference by its name and solely to Memphis, except the act entitled "An act to amend an act entitled An act to incorporate the town of Tazwell." In reference to this act the repealing clause is, "Also, the section of an act entitled," etc. Turning to this last act and the sections clearly intended to be embraced by the repealing statute, we find it has reference by name and in terms to the corporation of the city of Memphis, and delegates certain powers to its mayor and aldermen for the imposition of taxes. The section concludes: "And also any other act creating into a body politic and corporate the inhabitants of a certain territory lying within the county of Shelby, by the name of the city of Memphis, the Mayor and Aldermen of Memphis, or other corporate name whatever, or other acts amending said acts of incorporation, be and the same are hereby each and every of them repealed, and all offices created and held under and by virtue of said acts, are abolished."

Second section provides: "That the charters and amendments thereof of all municipal corporations within

the State, having a population of 35,000 inhabitants or over by the Federal census of 1870, be and the same is hereby repealed, and all municipal offices held under them are abolished."

By sec. 3 it is enacted: "That the charters and amendments thereof of all municipal corporations within this State, having 35,000 inhabitants or over at the date of the passage of this act, be and the same are hereby repealed, and all municipal offices held thereunder are abolished. The Governor of the State will ascertain and declare by proclamation to what corporations this section applies. Said proclamation shall be conclusive of its truth, and shall be made within ten days from the passage of this act."

Sec. 4 repeals secs. 33 to 80 both inclusive of ch. 92 of the act of 23d March, 1875, especially retaining sec. 81.

These several sections relate solely to the corporation of the city of Memphis, as they apply by their terms to municipal corporations having a population of 35,000 inhabitants or over, as ascertained by the Federal census of 1870.

Sec. 4 of the late repealing act concludes: "And the population within the territorial limits, as now defined, once the territory of all municipal corporations heretofore governed under and by virtue of said repealed sections 33 to 80 inclusive, are hereby resolved back into the body of the State, and all offices held under and by virtue of said repealed sections are hereby abolished," etc., abolishing all power of taxation in the corporate authorities, and reserving the

same to the Legislature, and transferring to the State all the public property of the corporation for the uses to which it has hitherto been applied.

It is insisted that this statute is violative of sec. 8 of art. 11 of the Constitution, which reads as follows: "No corporation shall be created, or its powers increased or diminished by special laws, but the General Assembly shall provide by general laws for the organization of all corporations hereafter created, which laws may at any time be altered or repealed, and no such alteration or repeal shall interfere with or divest rights which have vested."

If the provision of the Constitution has any bearing upon the charter and its amendments, of the city of Memphis, it is such as have been passed since the adoption of the Constitution of 1870, and it must follow, if any such are special or local, they are void, and present no matter for consideration in this suit; if others are general, they may be and have been repealed by the act of 29th January.

It is observable that this clause in the Constitution provides only for the organization of corporations hereafter created by *general laws*, and provides that such laws may at any time be altered or repealed. Nothing is said in the ordinance as to the power of the Legislature to repeal laws or charters of incorporation in existence at the time of the adoption of the Constitution. Under the Constitution of 1834 the Legislature had the power to pass the laws now attempted to be repealed, and as there is nothing in the present Constitution prohibiting such repeal, we are to infer

the Convention intended to leave that power in force.

It is difficult to see how these several statutes could be repealed by a general law in the sense of the Constitution. They relate to Memphis alone, were passed no doubt at the instance and for the supposed benefit of Memphis, and no other community or locality. To be repealed, they must severally be recited in the repealing act. This has been done, and while the repealing statute is special, for the benefit of Memphis, and applicable alone to it, to have required otherwise of the Legislature would have been to have required an impossibility. The only mode known or recognized has been pursued.

The objection that the act contains more than one subject matter, is not well taken. In *Cannon* v. *Mathes*, 8 Heisk., 523, Nicholson, C. J., says: "The true sense of the Constitution, as fully established by the authorities, is, that any provision of the act, directly or indirectly relating to the subject expressed in the title, and having a natural connection thereto, should be held embraced in it."

While on a casual reading of the act it may seem to have more than one subject matter, a close analysis will discover that all its provisions following the repealing clauses are made to prevent the uncertainty, confusion and loss that must necessarily follow upon the dissolution, unless provided against. The subjects of such legislation have a natural connection with the corporation existing or dissolving, and embraced in it, no way foreign to it, and in its life absolutely necessary to it.

29—VOL. 2.

We are not called on by this case to determine what, if any, effect this legislation as to the transfer of the public buildings, wharf, engines, streets, etc., has upon vested rights, and we intimate no opinion thereon. We are of opinion, and so hold, the act is constitutional and valid, so far as the questions made by the present proceedings are involved.

It is next insisted that the act entitled "A bill to establish taxing districts in this State, and to provide the means of local government for the same," is in violation of the Constitution. The first section is, "That the several communities embraced in the territorial limits of all such municipal corporations in the State as have had their charters abolished, or as may surrender the same under the provisions of this act, are hereby created taxing districts, in order to provide the means of local government for the peace, safety and general welfare of said districts."

In treating the question whether this is, as argued, a special law, we will consider the section of the Code already quoted in connection with that part of sec. 22 which is as follows: "That whenever any community under the government of a municipal corporation, at the time this act takes effect, having a population of less than 35,000 inhabitants according to the Federal census of 1870, may desire to be governed by the provisions of this act, the authorities of such corporation shall cause an election of the qualified voters of such municipal corporation to be held as other popular elections are held." It provides for the surrender of corporate power, etc. This 22d section applies

to every community in the State having, or that had, charters of incorporation, except Memphis. We judicially know that no other such community had a population of 35,000 inhabitants according to the Federal census of 1870, or in fact at any subsequent period. Such fact is a part of the history of the State, of which courts and legislatures must take notice. It is therefore clear that the act was intended and passed for the benefit of Memphis—that Memphis alone could at the time of its passage claim its exemptions from the conditions imposed on communities with populations of less than 35,000 inhabitants. We can as readily see that Memphis was intentionally and specifically preferred, by the use of the terms employed, as if it had been directly called by name—as if the language had been, "All the communities in the State, except Memphis, shall perform the prescribed conditions, but Memphis shall be a taxing district, without terms, qualifications or conditions, and by virtue of the passage of this act, and under laws and regulations different from those fixed for all other towns and cities in the State," already noticed, passed and approved. By an act, simultaneously with the taxing district act, the charter of Memphis was repealed, and at the time of their passage no other charter had been repealed. Both acts provide that they take effect from and after their passage, thus making manifest the *special* quality of the taxing district act as applicable to Memphis, and that Memphis alone did or could become a taxing district, at the instant of the approval of the statute by the Governor.

I am unable to understand the legislative process by which the Constitution may be evaded by indirection, and an end accomplished, that cannot be accomplished directly.

A statement of facts is the strongest argument that can be made in view of the constitutional inhibition of special legislation. The Constitution is the supreme law of the State, made for the good of all the citizens; by it all other laws must be interpreted and be consistent therewith. The fact that injury may result to a few by adhering to the paramount law, in no sense authorizes a departure from it. In such cases the argument *ab inconvenienti* is dangerous, and must not prevail.

The principle governing here is defined in *Dewine* v. *Board of Commissioners of Cook County*, 84 Illinois. There it is said, "Designating counties as a class according to a minimum population, which makes it absolutely certain but one county in the State can avail of a law applicable to such class, cannot but be regarded as a new device to evade the constitutional provisions forbidding special legislation."

In the act before us the agencies of government are: 1. A board of fire and police commissioners. 2. A committee on ordinance and local laws, to be known as the legislative council of the taxing district, consisting of the fire and police board and the supervisors of public works. 3. A board of health, to consist of the chief of police, a health officer and one physician. 4. A board of public works, to consist of five supervisors of public works.

This local government has power to establish work-houses and houses of correction; to declare by local laws what acts shall be misdemeanors, and when committed within the Taxing District to punish the offenders by fines and forfeitures, and by imprisonment and labor within and without the workhouse in default of the payment of the fines imposed as punishment; to cause the arrest of all vagrants, tramps and drunken and disorderly persons within the Taxing District, and provide for the punishment of the same in the manner above provided; to prohibit by fine the introduction of paupers into the Taxing District by steamboats, railroads or other carriers of persons; to regulate and suppress disorderly houses and houses of ill fame; to regulate and suppress gaming houses and punish gaming. All necessary judicial authority is vested in the President of the Board of Fire and Police Commissioners to hear and determine all cases of offenders against the ordinances and local laws of the Taxing District. "Said government has the power to pass all laws to preserve the health of the Taxing District; to define, prevent and remove nuisances within the District, and for a distance of one mile outside of the same; to make quarantine laws and enforce the same within ten miles of the Taxing District." "They shall have the power and it shall be their duty to condemn as nuisances all buildings, cisterns, wells, etc., which shall be found to be unhealthy," etc., "and cause the same to be abated," etc., with various other general powers for the support and administration of the local government.

In *Dartmouth College* v. *Woodward,* Ch. J. Marshall defines a corporation to be "an artificial being, invisible, intangible, and existing only in contemplation of law. Being the mere creature of law. it possesses only those powers which the charter of its creation confers upon it, either expressly or as an incident to its very existence. These are such as are supposed best calculated to effect the object for which it was created." " They enable a corporation to manage its own affairs," etc. He adds: "It is chiefly for the purpose of clothing bodies of men in succession with those qualities and capacities that corporations were invented and are in use." Citing 2 B. L. Com., 37. Bouvier defines a municipal corporation to be one that has for its object the government of a portion of the State, and although in such cases it involves some *private* interests, yet as it is endowed with a *portion* of political power, the term public has been deemed appropriate.

Testing the act creating the Memphis Taxing District by these definitions, at the same time carrying in mind the express purpose of that act to create a local government with a large grant of political power, it is certain the act can mean nothing else than the creation of a corporation. As already said, it is clear from the act itself that no other community than Memphis was contemplated in the passage of the act creating taxing districts for communities of 35,000 inhabitants or over. It is, then, a special law proposing to create a corporation, and falls directly within

the inhibition of sec. 8 of art. 11 of the Constitution of 1870.

By the act the Governor appoints the chief judicial officer, in whom is vested the many powers and duties enumerated for the prevention and suppression of crime, and for other corporation purposes; this officer is a judge of an inferior court to all intents and purposes, for the enforcement of the local laws of the Taxing District. Section 4 of article 11 of the Constitution ordains that judges of inferior courts shall be elected by the qualified voters of the district or circuit to which they are to be assigned, etc.

It is provided by the act that the commissioner appointed by the Governor as President of the Board of Fire and Police Commissioners, shall also be the chief executive officer for the Taxing District, besides having vested in him all necessary judicial authority, and shall receive a salary of $2,000 per annum, and further, that each commissioner shall receive a salary of $500. The difference in salary as to the one commissioner over the other two is because of the additional duties imposed by the additional executive and judicial offices, which is violative of the constitutional ordinance that no person in this State shall hold more than one lucrative office at the same time.

The act provides that the taxes necessary for the support of the government thus established shall be imposed directly by the General Assembly, and not otherwise. This is taxation without representation. Sec. 29 of art. 11 of the Constitution ordains: "The General Assembly shall have power to authorize the

several counties and corporate towns in the State to
impose taxes for county and corporation purposes re-
spectively, in such manner," etc.    While it is true
the general taxing power rests alone with the Legisla-
ture, it is equally true such power is for general pur-
poses, and was not intended to confer upon the Leg-
islature power to tax one community more than another,
but confines it to the passage of such laws as will
affect every community alike.    The framers of the
Constitution seeing that the several communities of in-
corporated towns and counties throughout the State
were unlike in their interests and demands, and that
such things must in each instance be controlled by
the particular circumstances, that a general State law
of taxation for local purposes could not possibly be
made to operate equally, justly and alike upon all,
provided for their regulation by each community to
suit its developments and necessities, it therefore ar-
ranged for the organization of such interior and con-
stituent governments, leaving it to the people to impose
upon themselves such burdens of taxation as in their
opinion were requisite to carry out their plans of
promoting their own welfare and interest in any cor-
poration or county purpose that location and offered
advantages might suggest, it being well known and
understood that, that which would greatly benefit one,
would be of no advantage to others, and *vice versa.*
There was no power given by the Constitution to the
Legislature to impose local taxation.    Its power is
general, and the provision of the Constitution last re-
ferred to is imperative upon it to delegate the special

power, with no power of exercise vested in or reserved to the Legislature.

That part of the act which levies a tax on property, merchants, etc., and provides for collection and paying out, falls within the objection already noticed.

The act provides that all justices of the peace within the Taxing District shall have jurisdiction over offenses against the laws of the Taxing District, with power to punish offenders in the manner provided by law, but they shall receive no fees of office for any process which they may issue in the exercise of this jurisdiction, etc. This is violative of the general law of the land fixing the fees of justices of the peace.

The act establishing the Taxing District of Memphis is, in my opinion, unconstitutional and void.

FREEMAN, J., delivered the following dissenting opinion:

On the 29th day of January, 1879, the Legislature passed a law entitled an act to repeal the charters of certain municipal corporations, and to remand the territory and inhabitants thereof to the government of the State. The first section specifically enumerates all the various acts incorporating or affecting in any way by amendment the corporation of the city of Memphis, and adds also the section of an act entitled an act to incorporate the town of Tazewell, passed January, 1830. This was an amendment to the Mem-

phis charter. All these acts, and all amending the said acts of incorporation, it is declared, "be, and the same are hereby, each and every one of them, repealed, and all offices created and held under and by virtue of any of said acts, are abolished." It is clear this section is a repeal in the most definite terms of all acts incorporating the city of Memphis, if language can express that purpose. I have no difficulty in holding the Legislature has the power to repeal the charter of a municipal corporation created before the Constitution of 1870 by a special law for that purpose. The language of the Constitution as to creation of corporations, art. 11, sec. 8, is:

"No corporation shall be created, or its powers increased or diminished by special laws, but the General Assembly shall provide by general laws for the organization of all corporations hereafter created, which laws may at any time be altered or repealed, and no such alteration or repeal shall interfere with or divest rights which have become vested."

Assuming this applies to municipal corporations, we do not think the language was intended to or does exclude the power to repeal the charter of existent corporations heretofore granted. Its terms refer alone to corporations hereafter created, not to corporations then in being, while this clause might have been construed to apply only to private corporations, and so we have been inclined to think, yet on investigation we find that in the Convention, when this clause was under consideration, an earnest and persistent effort was made to amend it by inserting the word "private,"

so as to exclude municipal corporations, but the amendment was voted down, another was offered requiring acts of incorporation of towns of over two hundred and fifty inhabitants to receive a majority of each house of the Legislature before they should become a law, which was also defeated. See proceedings of Convention, 132, 302, 319, 320. In view of these facts we hold it clear that this clause refers to and includes municipal as well as private corporations, and they must be created, or powers increased or diminished by a general law, and nohow else. While I have grave doubts on the question whether the title of this act ought to be held to include the expression of the subject of transfer of the city property, included in the fourth section, under a very liberal or rather loose construction of our Constitution, it may be done, and I yield to that point.

Is this a general law, under the Constitution, or is it an evasion of this requirement of our Constitution? The first section is, that the several communities embraced in the territorial limits of all such municipal corporations in this State as have had or may have their charters abolished, · or may surrender the same under the provisions of this act, are hereby created taxing districts, in order to provide the means of local government for the peace, safety and general welfare of such districts. This, on its face, would appear to be a general provision, applicable to all places, where charters had been abolished, or charters may be repealed or abolished, or may surrender them under the act.

The twenty-second section, however, provides that whenever any community under the government of a municipal corporation at the time this act takes effect, having a population of less than thirty-five thousand, according to the Federal census of 1870, may desire to be governed by this provision of this law, etc., they shall be included in the provision of the law upon certain conditions therein prescribed. Taking the two clauses together, the first applies to the towns having over thirty-five thousand inhabitants, whose charters had been abolished, or such others as may have them afterward abolished; and then the twenty-third section applies to all towns having a less number at the time this law took effect, who may surrender their charters, to-wit., the 29th of January, or at most, the 31st of January, when signed by the Governor. Now, the fact is, that there was but one city in Tennessee having more than thirty-five thousand inhabitants, the charter of which had been abolished, or was abolished, and there was no other city of this number of inhabitants, by the census of 1870, whose charter could by possibility have been abolished, for none such existed, as was well known. Under these facts, can it be held that this law granted privileges to any other community that might be able to bring itself within its provisions? As to the cities of over thirty-five thousand inhabitants by the Federal census, no other community except the one could receive the privileges granted. No other could ever by possibility bring itself under the provisions of the act, because it is physically impossible that any community that

did not have thirty-five thousand inhabitants in 1870, can ever be made to have that population at that time, to the end of the world; a fact of the past is an eternal unchanging and unchangeable thing. Its form, dimensions and proportions must eternally remain as when it occurred, and in this case as when the inhabitants were numbered.

If this be true, it is impossible that the law, so far as it applies to towns that had this number of inhabitants, can be a general law, or in so far as it applied to charters already abolished, unless we hold a general law to be one that is almost and solely applicable to a particular locality, and that definitely designated, or to be ascertained by a well known test, or characteristic existent at a certain fixed period which designation or characteristic can never be attained to or had by any locality that now exists or may hereafter exist in this State. In other words, can there be a general law that in fact applies and must be understood to have been intended to apply to one single community so definitely described either as having thirty-five thousand inhabitants, or having already had its charter repealed, as that it and it alone can answer this description, and no other does or ever can? We think not. It seems to me clear that the first section of the act, when construed in connection with the twenty-third, definitely confines the main provision of the act to cities having more than thirty-five thousand inhabitants, or whose charters had been abolished, notwithstanding the generality of the language used evidently to avoid this result.

By this last section all other towns in the State having less than this number, are specially provided for, leaving only the one for the other section to operate on. It is further provided as to such towns, "that if the rate of taxation fixed in the act should be in excess of what the community or taxing district need for support of its local affairs, or if the regulation provided by this act in regard to the fire, and police, and health . service, should be inapplicable to the conditions of such district, then the Board of Police Commissioners have power to suspend the collection of so much taxes as may not be needed, and also to make such regulations on the subject of fire, police and health as will meet the wants of the district.

We have, then, in the first part of the bill, a general law, as claimed, that in fact applies to only one city in the State, and enacts a body of regulations limited to that city, and which we know will in fact only operate upon that city, and were so intended; and then we have in the same act a set of regulations which operate in all other cities or towns on certain conditions, but with the power in the districts to control, practically, their own taxation and fire, police and health departments, having different powers from the one city affected by the first part of the act, and leaving the one city alone for the act to operate upon with striking clearness.

These last provisions are general, we may admit, but the first is as specific and local as an act can be made. This is put beyond question when we look

to the holding of the majority opinion, which I under-
stand to be that the act is but a re-incorporation of
the city of Memphis, equivalent to a new charter, or an
amendment to the old.     We know, as we have said,
that no other city has been rechartered on this theory
but the city of Memphis, and no other enjoys the gov-
·ernment provided in the main body of the act.     So
that we have the simple question as to whether an
act of the Legislature creating a simple corporation is
in accord with the Constitution, which says "no cor-
poration shall be created or its powers increased or
diminished by special laws, but the General Assembly
shall provide by general laws for the organization of
all corporations hereafter created."

If a law creating but one corporation, and under
which no other ever can be incorporated, is a general
law, then a specific law must be one that does less—
a thing hardly practical to be accomplished, even by
the ingenuity which contrived the bill.     The case of
*Devine* v. *Board of Commissioners of Cook county*, 84
Ill., 590, is an authority in point, and aptly illus-
trates the principle.     By the Constitution of Illinois
it is provided, "The General Assembly shall not pass
local or special laws, in certain cases, among other
cases mentioned, for regulating county and township
affairs.     A law was passed authorizing the issuance
of bonds for certain objects indicated, its operation be-
ing limited to counties having over one hundred thou-
sand inhabitants.     This law was held void by the
Supreme Court in the above case.     The court say its
very terms preclude it from having any application to

any county in the State except Cook county, for we take judicial notice no other county in the State contains over one hundred thousand inhabitants."

No express words that could be used could limit the operation of the act to the county of Cook more absolutely than those employed. The court adds, the circumstances of its passage, and the public history of the county, made this certain. We cannot doubt the correctness of that opinion. Let us apply the principle to this case. Our Constitution forbids the creation of any corporation except by a general law. We have a law general in terms, as to a particular class, that in towns having thirty-five thousand inhabitants, or having their charters already abolished, but we know from its history as well as the acts of the Legislature, from the census, and in addition from the proclamation of the Governor under the repealing law, that Memphis is the only town in the State to which it either can or was intended to apply. We are compelled to see, unless we shut our eyes to the facts, that all the cunningly arranged general verbiage of the act, its use of terms unknown in our language or laws, as applicable to municipal corporations, was contrived to evade this provision of the Constitution, and to enable an act to be done, an end to be reached, that could not be otherwise attained. In view of all these considerations, my judgment is so clear that the act is a violation of the Constitution in fact, and an evasion of it in terms, that I should be recreant to duty if I failed to hold it void. Let us look for a moment to the result of this holding

sustaining the act. A new charter with additional powers is wanted by a town in this State having two thousand seven hundred and fifty inhabitants, or any other number, as ascertained by the census. It has only to ask the Legislature, through its local representative, to pass a bill incorporating all the towns in the State having that number by the last census. The chances are as one to a hundred thousand, if there be that many towns in the State, that there will be no other town having precisely the same number of inhabitants. Under such a law the one town selected by its particular number will be rechartered, or its charter amended; no other will, however, in all the State, and under this ruling the law will be valid. Again, suppose the Legislature choose to classify on a large scale, and select twenty-five towns, each having different numbers of inhabitants, by the last census, for the operation, and pass a law rechartering or amending in one way one with six hundred, another with one thousand and fifty, and so on through the twenty-five, the numbers required being the ascertained number of inhabitants of each town desired to be affected, and you have an illustration precisely of the operation of this view, and so the same may be done of twenty-five or any specified number of towns whose charters may have been repealed. Twenty-five towns in the State can have new charters or amendments to suit their wants, all different, and all by a general law. This seems to me to be generalizing with a specialty that is surprising, but is legitimately the logic of the rule as I understand it.

30—VOL. 2.

The illustration given only presents the operation on a larger scale, but does not change the principle. Upon this view the clause of the Constitution is rendered nugatory, and the words may as well be stricken from that instrument. Imperative it is true, in theory, but practically to be evaded, whenever a supposed emergency demands it to be done. In this mode constitutional government has in all time past been gradually transformed by cunningly-devised evasions or constructions, until in many cases the authors of the Constitution would be entire strangers to the government which ultimately grew out of them.

Against all this I feel bound to enter now, and at all times my protest. I have looked at the acts repealing several other charters, those referred to in majority opinion, and find a legislative construction that supports this view I have taken by the same body that passed this bill. The act repealing the town of Hartsville, a village, it is specially enacted it shall have all the benefits of being a taxing district. No need for this, if the clause of the first section had already met the case. In others, as Elizabethton, the town is turned over to the jurisdiction of the county court. I hold the law void—an evasion of the Constitution.

Another difficulty is presented which cannot well be escaped. We have held at this term, in an opinion by the Chief Justice, that where an act by necessary implication repeals a former statute, its provisions being antagonistic, that such law must be referred to either in the title or in the body of the act. Under

this rule, only a few weeks since, the misdemeanor law of the last Legislature was held unconstitutional, and now stands stricken from the statute book. I did not fully concur in the application of the rule to the case in question, but did in the result. See cases of *Hartsfield & McGee* v. *The State*, MS. This case is one of the most marked violations of the rule conceivable. In 1875 the Legislature passed a general law for creating all municipal corporations in the future. That law specifically defined the powers, mode, and even rate of taxation, form of government, names of officers, in a word, provided for all proper corporate organization and powers, such corporation to be registered as therein provided. See Acts of 1875.

Upon the holding of the majority, the law now under consideration is another general law for incorporating all the towns of the State, and yet there is no reference either in the title or the body of the act to the other general law on the statute book regulating the subject. The two acts cannot stand together, unless we hold we can have two general laws equally operative in all like cases in every part of the State, the one diverse and different from the other. The construction given of the Constitution in McGee and Hartsfield's case must either be overridden or this law is void; as the majority opinion holds it valid, it can only rest on one of two views, either that the rule is overruled since it served its end by destroying a supposed objectionable law in the case referred to, or else that one rule is to apply to that class of legislation, and a different one to this. The

misdemeanor law died effectually under the rule laid down, that there could be no implied repeals in one State, and so remains dead. This law has more vitality in some unknown way, and lives in spite of the same objection; and these results, so different, all come at the hands of the same court, at the same term, within a few weeks of each other.

I leave my learned brother, the Chief Justice, to reconcile the contradictory rulings. It may be done, but how I confess myself unable to see. At present the only rule that could be formulated from the two opinions is, that a failure to refer to and designate the law or laws repealed, either in title or body of the act, is fatal to a law that gives jurisdiction in the first instance to justices of the peace in all misdemeanor cases, but in the case of "creating taxing districts," or new forms or modes of incorporating towns in one State, the same objection has no validity whatever, and such a law stands good in spite of this objection. Curious that but the facts of the two cases make out the conclusion with absolute certainty. I can but think the same construction should be given the Constitution in all like cases, or in all like questions. In this view, however, I am not sustained by the opinion of the majority in this particular case.

On the 29th of January, 1879, the Legislature of this State passed a bill entitled a bill to establish taxing districts in this State, and to provide the means of local government for the same.

By sec. 1 it is enacted that the several communities embraced in the territorial limit of all such mu-

nicipal corporations in this State as have had their charters repealed, or may surrender the same under the provisions of this act, are hereby created taxing districts, in order to provide the means of local government for the peace, safety, and general welfare of such districts.

Section 2. That the necessary taxes for the support of the government thus established shall be imposed directly by the General Assembly of the State of Tennessee, and not otherwise.

In administering the affairs, and for providing the means of local government in said districts, the following agercies and governing instrumentalities are hereby established:

1. A board of fire and police commissioners, to be selected and qualified in the manner hereafter provided.

2. A committee on ordinances or local laws, to be known as the "Legislative Council of the Taxing District," and which shall consist of the commissioners of the fire and police board, and the supervisors of the public works.

3. A board of health, to consist of the chief of police, a health officer, and one physician, who shall have been in active practice for the period of five years next preceding his appointment, who shall be an inhabitant of the taxing district, and for five years a resident of the county, and who shall be *ex officio* president of the board.

4. A board of public works, to consist of the five supervisors of public works, three of whom shall be chosen by the qualified voters of the people of the

taxing district, and two appointed as hereinafter provided, and shall serve for a term of two years.

By the 5th section it is provided the board of fire and police commissioners shall consist of three residents of the district five years    and    taxpayers of the same.    Two of these commissioners are to be appointed by the Governor of the State, by and with the advice of the Senate, and one shall be elected by the voters of the district.    The commissioner appointed by the Governor is to be president of the board of fire and police commissioners, and chief executive officer of the district, with a salary of $2,000 per annum. Each of the commissioners shall receive a salary of $500.    After the expiration of the term of the board of commissioners first selected, their successors are to be elected by the voters of the district.

The fire commissioners or supervisors of public works are to be chosen, one by the appointment of the Governor, one by the quarterly court of the county, as it appoints one of the fire and police commissioners, provided for in a previous section.    After the expiration of the term of office of the board of public works, their successors are to be elected by the voters of the district.

By the 8th section salaries are fixed for chief of police, and of other departments, with their subordinates.

By the 9th section an annual tax is levied on all taxable property, and all other resources of revenue, at different rates, to meet expenses of particular departments, amounting in the aggregate, we believe, to

about 103 cents on the $100, besides the privilege taxes.

We need only say here that this rate of taxation is different in amount, and largely beyond the taxes laid by the State by general law for State purposes, and not laid on this basis.

Before examining the several questions presented for discussion, we may remark that the first thing that strikes us in looking over this act is its startling novelty. We remember nothing precisely like it, or even bearing much resemblance to it, unless it be that the several "metropolitan police bills" and laws establishing county commissioners instead of our county courts, enacted during the disturbed times after the war, may be considered as being of the same class. In view of this it behooves us to examine with caution and calmness this seeming innovation upon the established order of things, known to us since the foundation of the State government. While this should be the case, we must remember that all that is new is not necessarily wrong, or in violation of the Constitution. Whether this new form of our government is better than the old, or whether the people for the present desire it so or not, are questions that cannot be permitted in the slightest degree, if possible, to warp our judgments. The legal and constitutional right is all that is before us as a controlling consideration in the investigation now proposed. I desire to look at the question involved in the calm, clear day light that alone can safely guide a judicial tribunal. I am aware of the extreme interest felt by the

parties concerned in the result. With results, however, we have but little to do. The path of legal duty is the safe one which I can follow; I shall endeavor honestly to find it; when found, shall faithfully walk in it, lead where it may.

I pass to the investigation of the main question presented by this act of the Legislature, to-wit, the extent and validity of the essential powers conferred, both in the State government and on this body created by it, and propose to bring them to the test of the Constitution, and whether they can be sustained as in accordance with the requirements of that instrument. Before this, however, I may say that those who assume this to be a simple municipal corporation, under a new arrangement for official control and direction confining the principle of the act in its operations to cities and towns or villages, will, it seems to me, find much difficulty growing out of the language of the act, as well as other considerations necessarily presenting themselves in construing it.

The language expressive of the subject of the bill, as given in the title, and to which the matter of the bill must in some sense be held to conform to meet the requirements of the Constitution, that the subject of the bill must be so expressed, certainly is not the language ordinarily or naturally adopted to express any such purpose. That language is usually "an act to incorporate or grant a charter of incorporation to a certain named town, village or city." No municipal corporation was ever before in Tennessee attempted to be incorporated under such a title. The title does

not even indicate that any act of incorporation was intended as its subject. It is a bill to establish taxing districts in this State, and to provide the means of local government for the same. The language already indicates the establishment or beginning of a new state of things not then in existence in the polity of the State. We had perhaps five hundred incorporated villages and cities, with municipal governments, granted in the forms of charters, as they are known among us, by acts of the Legislature. If this was what was intended, why not say so?

The word district, if we are to look at the language used to get the meaning, has a well known signification in our Constitution and law. Congressional district, civil district, school district, all well recognized divisions of the State, but having no necessary connection with the idea of a municipal corporation or incorporated towns. I confess it is hard, if not impossible, for us to see how the language of the title of this act can be construed to have for its subject the creation of a municipal corporation. It is true the provisions of the act are made applicable only to municipal corporations, but this does not serve to meet the difficulty. Why not use the ordinary language in such cases? If the Constitution is to be effective requiring that "no bill shall become a law which embraces more than one subject, that subject to be expressed in the title," it certainly means that the title shall be as expressive of the one subject, give some notice or indication of the body and purpose of the bill, at any rate shall not mislead. If this act

is held to operate irrespective of the fact of the districts being towns, and to involve the right of organization of this or any community into a district for taxing purposes, then it will be in accord with the constitutional requirements, and the title expresses truly its subject. But if it held to be only an act of incorporation for certain towns, under a different name, then it not only fails to express this subject in the title, but on the contrary expresses the opposite, at any rate a different subject. The word "district" is not the synonim of town or *converso*, nor the usage of our language. So that it seems to me impossible to hold this to be an act of incorporation of certain towns, or the creation of municipal corporations, without at once destroying the validity of the act, because the title not only fails to express this to be its subject, but as distinctly as language can do so, expresses a different purpose. Publish this in a newspaper for the information of the people, and who will ever dream from it alone that the city of Memphis or any other was being incorporated by it. Read it to any legislative body, with no previous knowledge of the contents of the bill, and no member would ever suspect an act of incorporation for a town or city. This cannot be doubted, I think. Can a bill become a law, the title of which not only fails to express its subject truly, but actually misleads? If so, the clause of the Constitution is nugatory.

If this act is in fact a simple act to grant charters of incorporation to certain towns in its body, then the title is a fraud and deception as not only

expressing such a purpose, but on the contrary, using language that does not give the fair test indicative of such purpose, it actually serves only to mislead. This cannot be in accord with the requirements that the subject shall be "expressed" in the title, not concealed, or a contrary one indicated. It may be said the body of the act explains its purposes, you can read it and see what it means. Exactly so, and so you could always do under the practice before the Constitution, but the necessity of having to read it to learn its subject was the change intended to be effected by the requirements of the Constitution. The purpose was, that the title should express the subject so as to give information as to what its subject was by hearing it read, not the act to be read for this purpose. You read the title, it says nothing of incorporating any thing, any body, or town. A local government is not necessarily a corporation. But when the bill is passed it turns out that the largest city in the State, a community that was only part of the body of the State, has been transformed into an incorporated town, has a new charter, a corporation has been created. But the title of the act mentioned or expressed no such subject or purpose. Is not this to nullify the requirement of the Constitution?

I may remark at the outset of the discussion of the main features of this law; that we may be misled at first thought in reference to this question by assuming that the simple question is, whether the Legislature can give the precise form of incorporation found in this act to the towns and cities of the State.

Because it so happens that only certain cities and towns are or were intended, and may be embraced in this act, it does not follow that the affirmative of this question would, under the act, necessarily sustain its validity. The question is one of power to so divide off the State into districts for purposes of local government, any part of it, as the territory of the State, and to grant to such district the powers herein granted, and to exercise with reference to such districts the powers directed to be exercised by the State government as such, independent of the fact of their being towns or cities.

That this is the real question is evident, we think, from a brief view of the act and the facts of the case. It will be remembered that before this the charter of the city of Memphis had been repealed, and its territory "resolved back into the body of the State." And so with all other towns showing more than thirty-five thousand inhabitants, who may surrender their charters under the act. They would simply stand as did the city of Memphis. The effect of such a repeal is to leave them simply as the other territory of the State, to be governed as the other parts of the State are governed.

The fact that the population was aggregated into a closer mass than happened to be the case in other portions of the State, would make no difference whatever in the relation of the territory and inhabitants to the government. They would simply be an integral portion of the State, their territory but a part of the State of Tennessee. The laws of the State

alone would control them as they did before their incorporation. The only difference in fact between the inhabitants of villages and cities and the balance of the State, when incorporated, is, simply, they live under two governments instead of one. The one a special municipal government, the other the State government. It follows that the removal of the inferior government simply leaves them with the one, but that is supreme over them, precisely as it was before they had been incorporated, subject only to the limitation prescribed in the Constitution, State and Federal.

This proposition is apparently too obvious to need further illustration, yet may require it. It is, however, as we think, one of vital importance in arriving at a correct conclusion on the question of constitutional power involved in this act. We shall, however, examine the questions in both aspects, that is in the view we have suggested, and also treating this act, but as an act to incorporate certain towns and cities. If the proposition we have stated be admitted, and we can hardly see how it can be questioned that the theory of this act involves the right to sub-divide the whole or any part of the State, say the Western District, or either of the two great divisions of our State into taxing districts, after the fashion of this act, then we doubt whether any man would be bold enough to maintain the affirmative. This, however, must be the question, unless we can show some element existent in this territory that differentiates it from the rest of the class, after it has ceased to be incorporated. When that element is pointed out, or can be made to ap-

pear by any fair legal logic or authority, either in our books or in reason, then a different view of the question might have to be taken. The only differences that can be predicated of this territory are, that the people are located nearer together, so as to form a community known heretofore as a city, village, or town, and the territory was once incorporated, but now is not. The repeal of the act left that as if it had never been incorporated, exactly the same as if it was any civil district or thickly settled neighborhood of any of the older counties of the State. In fact, precisely as it would any other territory whatever. It may be said this is true of every act of incorporation of a town or city, and so it is, but the Legislature has carefully guarded this act from being so confined in its title by using a word that has a distinct and definite meaning in our State, the opposite of or at least, having no relation whatever to towns or cities, as any word that could be chosen.

District, as we have said, is not the synonim of town, city, or village. No usage, either common or legal, can possibly be made to include in this word the idea of a town, city, or village. No citizen of the State, nor member of the Legislature, could have read the title of this act, and gathered from it that the subject was the incorporation of towns, cities, or villages. On the contrary, every one would say at once that certain portions of the territory of the State are to be laid off into districts for taxing purposes, and to exercise this function, or to be subject to taxation as such district, and have some kind of local

government, but what no one can guess, and that irrespective of the fact whether cities or villages were included, assuming the new division of the State to be a district, specially created for taxing purposes, then the imposition of a tax upon the people of that district, or any number of them, cannot be sustained, as done by this law. Taxes must be equal and uniform throughout the State, when levied by the State directly. Art. 2, sec. 28.

The act of 1827, ch. 49, authorizing the quarterly courts in the several counties to levy a tax to meet current expenses, was held void on two grounds: first, because the power of the State to tax was a legislative power, and could not then be delegated to justices of the peace; and second, because taxes were required, under the Constitution of 1796, as in the present, to be equal and uniform throughout the State, and the court said no two tracts of land lying in different counties would be taxed equally except by accident. *Marr* v. *Enloe*, 1 Yer., 457. Now, unless this requirement of the Constitution has been met by provisions in our present one, the taxing power would certainly be void under this decision, which has never been doubted on this question. We assume in this that the word district means what we all understand it to mean in ordinary usage and in our law, and does not mean town, city or village. In other words, that the bill means what its title imports, and is the assumption and exercise of a power to tax any chosen locality, for local purposes, that may be selected by the Legislature. If

the title of the act means differently, then we have no lexicon by which to fix the definition of the terms used, and may mould them to what may suit our views. But this is not construction, it is arbitrary assumption.

We may know historically what was intended, as we do, but when we come to ascertain the meaning of what is written, we must take the fair and natural meaning of the words used. This must be our guide, or we are at sea without chart or compass to direct us. What are the provisions of our present Constitution bearing on the question? "All property shall be taxed according to its value, that value to be ascertained in such manner as the Legislature shall direct, so that taxes shall be equal and uniform throughout the State." But one rate of taxation can exist in this State under this regulation of the taxing power. There cannot, under it, be a tax of ten cents on the one hundred dollars in value in one district of the State, and ninety cents in another. No man questions this proposition, I take it, in the language we have put it, that is, in one district of the State, as contradistinguished from another; is not this, however, the accurate mode of expressing precisely what the act purports to do? It proposes the Legislature shall tax one class of districts, or it may be only district, in fact, at one rate, over one hundred cents on the hundred dollars, while the tax for the balance of the State is only ten cents on each hundred dollars. No one will maintain this to be a tax "equal and uniform throughout the State."

It may be insisted it is a general law, as applicable on its face to the certain districts designated, that is, to the several communities, to use the language of the act, embraced in the territorial limits of all municipal corporations as have had or may have their charters abolished, or as may surrender them, and this cures the difficulty. Not so. The question is, not whether the act is a general law in this aspect of it, or a law of the land under the well known meaning of these words, but whether being such a law, the taxation provided for is equal and uniform throughout the State. To this question there can be but one answer. It is unauthorized, unless some other provision of the Constitution saves it. It is claimed to be thus saved by the next section (29) of the same article. The General Assembly shall have power to authorize the several counties and incorporated towns in this State to impose taxes for county and corporation purposes respectively, in such manner as shall be prescribed by law, and all property shall be taxed, that is, by those agencies so authorized, according to its value, upon the principles established in regard to the State taxation.

The first thing that suggests itself in reading this section is, that it applies to counties and incorporated towns, and not to districts. It seems strange that the Legislature of the State, law-makers, familiar with the Constitution, if they had intended to tax under this clause of the Constitution, should have failed to use something like a word to indicate the fact that the body created was a town, but on the contrary

31—VOL. 2.

having used a word to designate the "communities," convey no such meaning, but one very different and distinct from it. In view of the language used, "districts," and on the question of powers, and as coming ing under the clause of the Constitution, it would have been as well to have said all communities living between the Tennessee and Mississippi rivers, or between the Reel Foot Lake and the Mississippi river, or all the civil districts in any county where there are fifty inhabitants, or any other number, to the square mile.

It is clear beyond all question, I think, that no such tax can be laid without special authority in some clause of the Constitution which qualifies the effect of article 28, requiring the taxes to be equal and uniform throughout the State. And I think it is equally clear that by the fair meaning of the act, in fact by no meaning of the words used, can the communities spoken of be brought under section 29, except by holding the Legislature has worked wiser than they thought, or more truthfully, has used language that expresses one thing, and have done another and different thing. Assuming, however, for the moment, that this bill is but a reincorporation under the guise of "districts," not towns, of the towns intended to be affected by the act, let us examine whether this effort at taxation can be sustained. We cite from the well known case of the *People* v. *Draper*, 15 New York, 537, a principle sound and applicable to the construction of our Constitution and to this case, Judge Denis says, In determining this question we must keep

in mind that the Constitution was not framed for a people entering into a political society for the first time, but for a community already organized and furnished with legal and political institutions adapted to all, or nearly all, the purposes of civil government, and that it was not intended to abolish the institutions, except so far as they were repugnant to the Constitution then framed. And we may add, in our own case, nor was any violent change purposed or intended to be authorized in the modes of action, the only known political divisions, that exercised the taxing power in our State, counties and towns.

Further on, in discussing the question of how an act is to be shown unconstitutional, he says, " I do not mean that the power must be expressly inhibited, for there are but few positive restraints upon the legislative power contained in the instrument. But the affirmative prescriptions and the general arrangements of the Constitution are far more fruitful of restraints upon the Legislature. Every positive direction contains an implication against the contrary to it, or which would frustrate or disappoint the purpose of that provision."

In view of these principles, and in the spirit of candor, let us test this question. At the formation of our present Constitution, or rather the adoption of the clauses under consideration by the Convention of 1834, it had been settled that counties could not be authorized to impose taxes. To meet this decision of *Marr* v. *Enloe,* this clause was provided, its purpose is evident, that is, that henceforth taxes were to be authorized to be levied by such counties. But pass-

ing from this for the present, the clear intention of the Convention and meaning of the Constitution is, that the State can only levy a tax equal and uniform throughout the State. Whenever the tax is levied directly by the State, this rule is imperative. It is the limitation affirmatively prescribed for the exercise of the taxing powers, and standing alone, includes all the taxing power in the Legislature. Nothing is left to the action of the Legislature independent of this clause, nothing is outside of it, nothing to the discretion of the Legislature. It must be done this way, and nohow else. But there is another matter of taxation needing a different rule. There were counties in the State where their needs were small, their expenses light; others were larger, and expenses heavy. The uniform rule had been tried. Experience proved that a more flexible rule was demanded, that is, that they should henceforth tax themselves, under the authority of the Legislature, it is true, but still, when taxed, the counties were to impose such taxes. It cannot be conceived that it was intended to make no real change in this matter from the law as it then existed. This would be the result if the Legislature could tax a county or counties of the State by general law, as before the Constitution of 1834. It would be entirely optional with that body, whether the Constitution had adopted any rule at all, so that the clause is either imperative that such taxation shall be by the counties authorized by the Legislature, or else we have no rule at all, practically, except the will of the Legislature. That body can either tax in this

way or directly, as it may choose, and the provision is useless, ceases to be a rule, scarcely reaches the dignity of advice. Uniform, contemporaneous and subsequent legislative construction from 1834 down to the present hour, has settled this as the meaning of section 29 as to the counties. He would be a bold man who should propose to the Legislature to levy or impose county taxes by a direct act of the Legislature. Will my brethren of this court, who differ from me, hold this can be done? If not in the case of counties, why not? I should like to see either the affirmative or the negative reasoned out and maintained. If the affirmative is held, it would overrule what was decided in *Pope* v. *Phifer*, 3 Heis., 682—county commissioners cases—and bring us back to the support of the odious system then sought to be fixed on certain counties. Will any man consent to this? Would the people of Shelby county, and the other counties that once enjoyed these "peculiar blessings," be willing again to be placed under such administration? I suspect not. If, however, the negative is asserted, then the same reasons that must be given why a county should tax itself, inevitably stands good in the case of towns, except that the argument is tenfold stronger in favor of the more ancient right of the towns, as compared with the power in the county derived from the Constitution of 1834, not previously known or exercised by them. But to return, the rate is left to the judgment of the representative bodies of the *quasi* corporation, the county and the town corporation in the case of the town. The county court was the

body through which county taxes were imposed, in towns the legislative body, common council or board of mayor and aldermen, or whatever might be the name of the body corresponding to these. That the idea of such a representative body of the people to be taxed should exercise this power, was the one on which this provision was based, appears clearly when we read the argument of counsel, as summed up by Judge Catron in the case of *Marr* v. *Enloe*, as well as the opinion of the court, and find that one main objection urged against the act of 1827 was, that the taxes were to be levied by justices of the peace of the quarterly court, not through the representative of the people, who · are responsible to them, and "dare. not tax them oppressively," to use his language, but by a few individuals in each county, holding permanent offices and wholly irresponsible to the people. This was said in view of the fact that under the then Constitution justices were appointed by the Governor, and held their offices for life or during good behavior.

In response to this he went on to say that the act could not be constitutional, because taxation and representation are inseparable, as they are in every free government.

In view of these considerations, then the universal sentiment of one people, and the fact that local taxes could not be adopted, by a general law, to each locality according to their needs, the exigency was met by making the justices of the county court elective, and devolving upon the Legislature the duty of au--

thorizing them to impose the taxes on the people rep-resented by them, and who had chosen them, and might displace them at the end of their terms of office.

As to the incorporated towns, the history of such bodies for ages had been that they were self-governing bodies. The Legislature had incorporated towns from the formation of the State, but it had never entered into the mind of a single member, that such a local government could or should be established, and the State, or any other body, should select the local officers of such government, or impose the taxes needed for the support of the same. It took upward of eighty years, and the pressure of assumed, probably certain impending financial ruin, to a great city, to compel the invention of a new system with such features as are found in this bill, and engraft it on the work of our fathers. Certain it is, however, that the precise same powers applying to counties, apply to incorporated towns. From this there is no escape. We have held that counties must tax through the county court. On what principle can a different rule be worked out for the government of our town?

In view of all this, I cannot doubt that the rule for the county and corporation taxation is by authority conferred on them, to tax themselves, as their wants might demand, under section 29 of the Constitution.

But here we are met by the plausible argument that the Legislature is empowered to authorize counties and incorporated towns to impose taxes, for county and corporation purposes, therefore that body can do

directly what it may authorize these bodies to do. This is the key to the entire theory that maintains this power. If this is met the whole must fail.

First, in view of the well-known history of the country at the date of the Constitution of 1870, if such powers had been proposed to be reserved to the State and the Governor, as are now insisted on, the man who voted for the proposition in seven out of ten of the counties of the State, would have been blasted, burned in effigy, and in the cities of Nashville and Memphis, and in Shelby county and in all other counties, where county commissioners had ruled, he would have been in infinite danger of a coat of tar and feathers, if not worse treated. Can it be now soberly believed, by any man who will give fair play to his judgment on this state of facts, that the convention, representing as we know it did, these sentiments, and even passions and hates of our people, on these questions, has intended and actually done, what will enable any Legislature to make this policy a permanent part of our system of government, for it is beyond all dispute, this law embodies the very principles that were so odious to the people in the Metropolitan Police and County Commission bills in their day. If there was nothing else, this would be to me conclusive, as to the intention and purposes of the convention. When the intention is ascertained, it is imperative upon this court, otherwise a Constitution is an idle thing of as little weight or even less than a statute. If this court can disregard the intention of the convention, when fairly ascertained, then the con-

vention make one Constitution, and we make and enforce another and different one. Such I think is the result of the holding of the majority in this case.

I might concede the general proposition that what the Legislature can authorize to be done, it may do directly, as sustaining this bill, if in this case, there was nothing in the way in other provisions of the Constitution, and other established arrangements therein provided, which would be violated or disarranged.

It is then certain, I think, such was not intended as we have argued, and this is made more evident by the uniform action of the government in all the past as well as since 1870, up to the present law.

But when we take sections 28 and 29, with the reasons for the latter section arising out of the nature and necessities of county and corporation taxation, and the case is made out by a weight of consideration little short of demonstration. It has been found impossible to impose taxes in the case of counties by a general law, some counties indeed one rate, some another. By a general law, in some counties a tax adequate to their wants, would leave another county with wants half supplied. This experience, impracticability, caused the change, and the idea of taxation as inseparable made the change in the mode of election of justices of the peace, giving them short terms of office, and election by the people of their civil districts, thus representing the whole county.

These things produced the section 29. It cannot be fairly doubted, in view of this alone, county courts were intended to impose their own taxes. The same

words are used in giving the power to incorporated towns. The same necessity exists with them to impose their own taxes. The same impossibility exists of imposing by the Legislature, under a general law, an amount of taxes on property adapted to meet the varying and diverse wants of their bodies. An amount sufficient to meet the wants of Memphis, for instance, would not be needed by Jackson, Clarksville or Chattanooga. The surplus would not be real taxation but exaction for accumulation, for taxation is rightfully but the share of the citizen levied to meet the actual wants of the community. While this can never be with strict accuracy ascertained, yet the principle is sound, and whenever it is clearly seen that money is levied over and above the wants, and for purposes of accumulation or such a result, then to that extent the levy is void.

The same necessity for the rule existing, the same practical impossibility of doing otherwise, and the same language used, in case of towns, as is used in the case of counties, it follows logically that the rule applicable to one is the rule to the other.

In the case of corporations this is made overwhelming by the fact already alluded to, that these bodies had in all time past been so accustomed to tax and govern themselves, had always been recognized as self-acting governments; still more conclusive is another fact, that in the 22d section of this very act, this difficulty was found insurmountable, and provision is made for towns having less than 35,000 inhabitants, not only to dispense with portions of the machinery provided

Luehrman *v.* Taxing District.

by the act, but also for suspending the collection of the amount of taxes imposed by the act, thus leaving them to really tax themselves, as formerly, and at the same time demonstrating the other proposition maintained, that this was not intended to be, and is not a law for any locality but Memphis. The taxes imposed suit that District, but *no* other.

The demonstration, however, is this—that it is found impossible to do the work of taxation under this system by direct legislative action, a dispensing power had to be inserted in this law. This concedes the fact to be as stated, and that concession ends the argument; a system that is impossible to be carried out, or put in practice by direct action of the Legislature, can never be contained in the Constitution of our State, without stultification of the convention that adopted it. But when we remember that the other system was in operation at the time, and in successful operation, and has so continued up to this bill, and had already been the rule as to incorporated towns, I am totally at a loss to conceive any sound ground on which the opposite theory can be sustained—alone, as I think, on the principle of a necessity born out of the real or supposed distress of the one city whose wants are intended to be met by the main provisions of the law. When it can be shown the Constitution has ordained or permits such a system as cannot be practically acted on, without conferring a dispensing power on another body to enable the law to work, then I may concede this law to be constitutional, but not until then.

A short statement of the principle underlying the two sections will make this, if possible, stronger. The rule is taxation by a law uniform throughout the State. This is the limitation on the general exercise of the taxing power by the Legislature. This is for State purposes, and is therefore critically practical. The other rule is also a limitation as definite as can be, as is shown by the necessities inherent in taxing counties and towns, that each shall be taxed only to meet their peculiar needs, and this cannot be done by a general law, the direct act of the Legislature; therefore the convention recognized these agencies, as the sole means by which taxation, not uniform throughout the State, could be levied, and so provided and imbedded the exception from the general rule in the instrument, that when local taxation was to be imposed, counties and incorporated towns could be authorized to impose them. This is imperative and affirmatively prescriptive because of the impossibility of doing otherwise, therefore prohibitive necessarily, and so the only rule of action for that body. This accords with the historical truth, meets all the difficulties of the question, gives us an easy, natural and appropriate system in accord with republican government, and still more is the system then working, and one then approved and endorsed by the people, with unmistakable emphasis, and against all innovations, upon which such as the present, there was then aroused an active life, the most intense and determined opposition from the entire State.

Is all this an illusion, or is it not the simple truth

of history, and the fair and inexorable logic of the never-to-be-forgotten facts of the case as we know and remember them? If so, against such innovations I must now and for all time solemnly protest.

The last argument, a plausible one, is that the taxing power is legislative, and the Legislature has all such power, except when restrained by the Constitution. The principle may be conceded as a general statement, but the answer is simple and easy when applied to this case. It is found in the precise limitations we have discussed, and these limitations are imperative in their nature, confining the Legislature to the rule of local taxation, through these two agencies, counties and corporations, and none other. All other modes are outside of the language, as well as the spirit of that instrument, and as such, usurpations, and exercise of power forbidden. The system may live for a time, but will die certainly from inherent decay. In fact in all but one essential feature, taxation, it is a government provided it shall cease, for after the first term, the officers are to be elected by the people, thus confessing that the departure for an exigency could not be permanently worked into our republican system.

It is a significant fact, however, that cannot be overlooked, that in all the period up to 1834, there is no act of incorporation of any town, that does not confer on the corporation the power to lay and collect its own taxes, to use the language of the act of 1817, incorporating the town of Greeneville, " for carrying the necessary measures into operation for the benefit of the town." See Scott's Revisal, vol. 2, 416. The same

provision is found in all the earlier charters. See Knoxville, *Ib.*, p. 299; Nashville, *Ib.*, vol. 1, p. 960. This was never questioned; yet the rule for levying all taxes by the State was that of uniformity, and as we have seen, was so applied to counties, departments strictly appertaining to the government of the State.

The explanation of this is easy, when looked at in view of the nature of a municipal corporation in our law, their traditions, and their history. They are governments, subordinate in some sense, certainly by our system dependent for existence on the will of the Legislature, but when created are of necessity governments. They are defined by Dillon, vol. 1, p. 92, sec. 9*b*, as "bodies politic and corporate, established by law to share in the civil government of the county, but chiefly to regulate and administer the local or internal affairs of the city, town or district which is incorporated." Keeping this idea in view, our fathers could not have conceived in the days after the revolutionary war, that a government, even local, could properly exist according to the American idea of a government, without the power of imposing its own taxes, through its own representatives. It was, therefore, philosophically correct in them, whenever it was conceded the Legislature had power to create their corporations, that one of the inherent and necessary incidents of such governments was the exercise of the taxing power; to create could not be exercised without this feature being a part of the creation. It follows, that having the conceded power to create corporations municipal, the incidental power of taxation by these

governments was a consequence, was therefore authorized by fair implication by the Constitution, and thus the general rule of uniformity was never thought of being applied to these bodies, nor the other rule that the taxing power was legislative in its character and could only be exercised by the Legislature itself, and could not be granted to another body to be exercised at its will. They had legislatures of their own—one without such a body had never been known. This is the theory on which they evidently acted, or else all corporation taxes would have been compelled to be levied by a general law, equal and uniform as to all the corporations of the State as in the case of counties. The fact that no such law was ever passed for collection or imposition of taxes in a municipal corporation, and that such was the rule as to counties, shows that there was a well-understood and recognized distinction between counties and towns, before the year 1834.

In fact, the addition of the words incorporated towns, in section 29, was but surplusage and for abundant caution, no town had ever existed in the State without the undisputed exercise of this power. It was only intended, perhaps, to embody and make certain this universally conceded right by adding to it the force of constitutional recognition, or historically, we might well say, it did but recognize in the Constitution what, by tradition, usage and law, had always been known and established as an inherent element in the existence of all such corporations.

I need but add that whenever it is admitted that

corporations of this kind are local governments and the Legislature authorized to create them, then it is impossible to create the thing without its essential element, govermental power. A government without the power to impose taxes or raise revenue is a paradox, a self-contradiction, an anomaly both in law and in fact. This power is universally conceded to be inherent in all governments, by all authorities and writers on the question, and may be accepted as an axiom that needs no proof. The statement of the principle proves itself. We need but say in support of this, that practically such a government would be lifeless, and without the power to live, would be a body without the principle of vitality, so that its creation by the Legislature would be an act of fatuity, an abortion. The power to create such governments, and the act of doing so, as governments, necessarily carries with it the endowment of vitality. It was this governmental distribution that is recognized by our Constitution, intended to be perpetuated, as one of the agencies in the machinery of our State Government, with this inherent element in it, and through such an agency local taxes may be imposed where intended to be imposed, but no other kind is so recognized.

In support of these general views, I refer to the opinion of Judges Cooley and Campbell of the Supreme Court of Michigan, in *People, ex rel.* v. *Hurlbert*, 9th American Reports, 104, *et seq.*, and the case of *People, ex rel.* v. *Common Council of Detroit*, 1st Am. Rep., 202. The first case was the question of the power of the Legislature to appoint the officers of the corporation;

the second raised the question whether the Legislature could compel a town to incur a debt. Both questions were decided in the negative. We refer also to an able opinion of the Supreme Court of Illinois, by Judge Brige, 15th vol. Am. Rep., 282, where it was likewise held the Legislature had not the power to compel the creation of a debt, as in Michigan, and where he says, of a board creating the debt by authority of the Legislature, under a clause like ours, as to authorizing incorporated towns to impose taxes, not being a corporate authority of the city of Chicago, it cannot be said they are the authority contemplated by the Constitution, in whom the Legislature may vest the power to impose or collect taxes for corporate purposes, p. 285. The power to tax involves the power to take from the citizen, for purposes of government, his property. As a matter of course it inheres in this definition, the idea that the property so taken by the government is for its own governmental purposes, not of another. When the State has created a municipal government, it is not the State government in any proper sense; its officers, while in some sense they are State agents, this is but in a secondary and qualified sense, they are in fact the officers of that other and inferior government, which has been created by the State, which government is so distinct, as a government, from that of the State, that as we have held, for the same offense the party may be punished by each government. See manuscript case.

And so is the general rule. The officers are not, as we have said, State officers, under the constitutional

32—VOL. 2.

provision, that no person shall hold more than one lucrative office at the same time, as held in *Ind. State* v. *Platt*, 15 Am. Rep., 239.

If this be conceded, then it follows that each government should impose its taxes, and unless otherwise provided by the organic law, each would govern its own territory, and as a matter of course collect the revenue in its own sphere, for its own purposes.

The idea of one government imposing the taxes for another, is of itself an anomaly unknown to the philosophy of government, and involves all the severest elements of tyranny, not to say slavery, theoretically if not practically.

We conclude *this branch* of the discussion by a quotation from Judge Cooley, 15th Amer. Rep., 211. We need hardly say, that he probably is now the leading jurist on the continent on such questions. He says: "Whoever insists on the right of the State to interfere and control by compulsory legislation the action of the local constituency in matters exclusively of local concern, should be prepared to defend like interference in the action of private corporations and of natural persons. It is as easy to justify on principle a law which permits the rest of the community to dictate to an individual what he shall eat, and what he shall drink, and what he shall wear, as to show any constitutional basis for one under which the people of other parts of the State, through their representatives, dictate to the city of Detroit what fountains shall be erected at its expense for the use of its citizens, or at what cost it shall purchase and how it

shall improve and embellish a park or boulevard for the recreation and enjoyment of its citizens. The one law would rest upon the same fallacy as the other, and the reasons for opposing and contesting it would be the same in each case. And while it may be entirely possible that in any particular instance the interference would be beneficial to the person or community whose rights are involved, it is not to be overlooked that an interference to compel a person to submit to something for his own good, may be made use of as a precedent to compel him at some future time to submit to extortion and plunder. The law very properly draws a line between that which is admissible and that which is not, and it does not allow outside dictation in matters purely of local concern for one very good reason, among others equally good, that the motive for outside interference will very likely be something besides a desire to do good to a community in which the parties interfering have no personal interest, unless of a merely sentimental nature, and whose burdens they are not to share or enjoyments participate in. All such matters are left to those whose interests will prompt them to act with prudence and who, because of their interests, and because they relate to matters that must come under their own view and observation they are presumptively best qualified to decide upon."

These are words of wisdom and weight that may well be pondered in connection with the strange innovation on long-settled usage and tradition, inaugurated by the enactment we are now considering. In that

case the effort was to authorize a debt to be created without the assent and action of the corporation. The principle in this law is the same. The taxes are imposed directly by the Legislature, a debt thus created by the direct action of that body, which may be to any extent that body may choose to make it. In fact, objects on which revenue may be expended in the way of, so called, public works, and official salaries, with the like fruitful sources of distribution of the people's money for the reward of partisan or more corrupt ends, familiar to all unfortunately in this age, lie along the pathway of this new system beyond the check or control of the people who are to pay. It might work well for to-day, but as certain as men remain what we know them to be, it would ultimately prove a burden grievous to be borne, if not more ruinous than the old system has ever been.

We turn now to a brief review, in a summary way, of the other leading features of this curiously interesting creation of the Legislature. The district is to be governed by certain commissioners, some of whom are appointed by the Governor for their first term of office, some by the people, some by the county court—after this term, they are to be elected by the people. They are required by this act to be residents of the district. The President of the Board of Fire and Police Commissioners has the judiciary authority to hear and determine all cases of offenses, and he is an appointee of the Governor. The legislative body of the district is composed of these commissioners, and they have all the usual, and we may add, the fullest,

powers granted to the legislative authority of a city corporation. They can establish work-houses, create or declare what shall be misdemeanors, punish by fines and forfeitures, imprison, and in fact exercise the fullest powers, as we have said, confided to such governments. All these officers and agents are declared to be officers of the State, in their official action touching said local government. And then in certain cases it is provided, the Board of Fire and Police Commissioners have the power to suspend the collection of such taxes as may not be needed for the support of the local government.

From this short summary, it is seen that we have a government established, with power over property and liberty, for the power to impose fines involves the power to take property, and to imprison is to deprive the citizen of his liberty, and then the judicial power by which regulations are enforced, and these powers executed and brought to bear on the citizen, and yet all these officers are the officers of the State, not of the corporation. Some are elected, it is true, by the people, but the others are elected by the county court and the judicial officer by the Governor of the State. To all these officers salaries are attached as a matter of course.

Where the power can be found or whence derived, by which the Governor of our State can appoint a judicial officer, who is an officer of the State, except in the cases of vacancy provided for in the Constitution, or in case of disqualification, is more than I am able to conjecture. I am equally unable to see where he derives the authority to appoint officers of a cor-

poration or a district. If this be held an act of incorporation of certain towns, as the majority hold, that is, the establishment of municipal governments for them, then they are local, and not State governments. The officers are local, not State officers in fact, though so declared by the Legislature, so far as their official functions are concerned.

We may be asked, where is the prohibition in the Constitution against making such appointments? We answer, in the fact that for all the officers of the State or counties, there is a settled mode of appointment in the Constitution. These affirmative provisions must be held prohibitions. As to appointment by the county court, this is prohibited by the very nature of this court. It is the police and governmental agency of the county, and as such its duties appertain to the county and its concerns. It is confined exclusively to these. The cases where this body has the power to elect or appoint officers are specially provided for. They elect a ranger and coroner, and in case of vacancy in the office of sheriff, register or trustee, they fill the vacancies, and a vacancy of their own clerk's office is also filled by this court. This much of elective and appointing power is granted them in the Constitution, no more, except the general provision of article 11, sec. 17, providing, no county office created by the Legislature shall be filled otherwise than by the people or the county court.

I concede the general proposition as a general proposition, that the powers to be given a corporation, whether private or municipal are in the

discretion of the Legislature in the main, and it is so laid down in general terms by text writers and courts frequently without qualification. In the case of the *People* v. *Hurlbert,* 9 Am. Rep., 106, that greatest constitutional lawyer now living, Judge Cooley, with the concurrence of the entire Supreme Court of Michigan, gives the weight of his judgment to the accuracy of the general statement. He says: " We seldom have occasion to inquire whether this idea of legislative authority is, or is not, too strongly expressed, for the reason that its exercise is generally confined within such bounds as custom has pointed out, so that no question is made concerning it. But such maxims of government are seldom true in anything more than a general sense, they never are and never can be literally accepted in practice." He then proceeds, with unanswerable weight of argument and reason, to maintain the views I have laid down, and point out the proper qualification of the generally accepted statement. The substantial result of his opinion is, that as to all the local government, the officers must be elected by the people governed by them, and as to taxation, that essential feature of all government, it resides inherently in the people too, and for local purposes, must be exercised by them through their local representatives. See also 15 Amer. Rep.

It may be said the Hurlbert case, 9 Amer. Rep., was decided on a clause of the Constitution of Michigan, but on reading the opinion, it will be seen the opinion of Judge Cooley is based as much on the general principle of the law on this subject, as on the

other ground.    In fact he gives the whole weight of his argument to the decision of the question on general principles.    He says, " the State may mould local institutions according to its views of policy or expediency, but local government is a matter of absolute right in corporations, and as such cannot take it away and leave them municipalities.    It would be the boldest mockery to speak of a city as possessing municipal liberty when the State not only shaped its government, but at its discretion sent its own agent to administer it, or to call that a system of constitutional freedom under which it should be equally admissible to allow the people full control in their local affairs or no control at all."    Again he says, " So far then as the act in question undertakes to fill the new offices with permanent appointees, it cannot be sustained either on general principles or on the words of the Constitution." He assuredly gives the weight of his authority and name in favor of this view I have taken.    See also 51 Ill., 17;   2 Amer. Rep., 278;   53 New York, 128; 13 Amer. Rep., 480.

Let us serve up the powers of this new form of government and its officers—some appointed by the Governor, some by the County Court, some elected— the judicial officer by the Governor.    It is true, after the first term they are to be elected by the people. But on the question of power, we must look at the result of such a system, and what is involved in the exercise of such powers.    The fact that the Legislature provides here for future election is but accidental. The power to appoint for the first term involves the

power to appoint for all time, if the Legislature choose. Let it be established that all the municipal officers of the State may be appointed by the Governor, and let this power be put in operation, and look at the result—twenty-five thousand or even more offices may thus be placed in the hands of the Governor for distribution. In many of our large cities and towns, these officers have control over large revenues, and thus we have the nucleus out of which will grow immense sources of corruption and peculation. Was it intended by our people to clothe the Executive of the State with such an immense field of patronage and power? Assuredly not.

Again, the present officers are required to be residents of the district. But this is a matter of discretion with the Legislature. No constitutional provision requiring this—for the whole thing is beyond all constitutional range—the rule may be changed at any time, and a resident or favorite of the Governor from any other section of the State, may be allowed to be appointed, as well as a resident or tax-payer. The chief officer may be authorized by the Legislature to be appointed from any portion of the State, and who can declare such a provision of the law void? Can such a power so dangerous to the liberties of the people, be in accord with the theory of our republican constitutional government? Surely not. Again, what can the body of the Legislature know or care, as to the local interest to be affected by their legislation. Practically, whatever the member of the Legislature from the county where the taxing district is situated, or

members if 'more than one, shall ask to be done, will be done. And thus it may be the people of such a town as Jackson will be governed by one man elected by the people of the county, and all their local concerns be dependent on his will; their property taken by taxation, as he may suggest, and they have no power to control the result; officers in any number may be created, and salaries fixed at any rate by this process, and who can stay the tide? The evil does not stop here. There is a legislative body, but the Legislature may just as well, on the theory that will sustain this law, give the entire government to one man, and clothe him with all the power of this government over property and liberty. There is no limitation—all is left to undefined, unlimited legislative will. That man may be directed or authorized to make out his budget for the taxes for two years, and the Legislature may adopt it, and thus the property and liberty of the city be for the time in the hands of one man, appointed by the Governor. All this and more is involved in the concession of the validity of this law. To such consequences I can never yield my assent. It may be said these people are represented in the Legislature as the rest of the community are. But this is an illusion on such a question. The member of the Legislature from the county is not the representative of their peculiar local interest, nor is he directly responsible to the people of the town except as they are a part of a large constituency. But as to the Legislature as a body, they have neither interest or concern in this local government, nor responsi-

ble to it. It may be said that such is the case with the members as to every section or county but this one. But the answer to that is easy. As a Legislature, on my theory, they can pass no law that will affect one section or county that will not equally bear on their own people and their interest. This is the policy that underlies the requirement, that laws shall be general, not special. But on the theory of this bill, this guaranty of responslbility to his own people, because the laws must operate on them alike with others, is swept away. All legislation in reference to these districts will be purely local in its operation, and what will the members from other sections care for a taxing district that may be established in East Tennessee, or it may be in any other town in West Tennessee? The safeguard that fixes responsibility on every member for his action to his people, because the law will operate on them alike with others, is not in this law, and this is strikingly so as to taxation, for it cannot practically be regulated and fixed by a general law for these communities. It must be at one rate for one and a different rate for another, of necessity, as their wants may demand. This is felt by the Legislature in this bill, and hence comes the provision for suspension of the collection of taxes, when more revenue is assessed than is needed, but this is at the discretion of the commissioners. How long will it be before they will find the means of spending all that may be imposed, or when greedy friends want profitable jobs, how many cases will there be in which the collection will be suspended? If there was noth-

ing else in this bill except what we have faintly and imperfectly sketched, and the principle of irresponsibility we have referred to, it would be enough to forbid its ever being recognized as in accord with the principles of our system of government, or in fact with any sound theory of republican institutions.

But when we look at the power involved in the authority of the Legislature to establish and perpetuate such a system, in any and every part of the State, the picture is appalling. Let us examine for a moment the aspect of the case. The same principles of taxation, beyond all queston, that is local, may be established for any county under the same theory, for the provision that authorizes incorporated towns to levy taxes, applies in the same terms to counties. Counties and incorporated towns may be authorized to impose taxes for county and corporation purposes. Now if, under this clause, the Legislature can tax directly, as in this case for these purposes, as in this law, then that body can sweep away at any time the established order of things since 1834, and impose taxes for every county on the principles of the bill. It must be done however by general law, it may be said. Did the incorporated towns of the State ever impose taxes by virtue of a general law? Never. Yet this taxation is under this very clause. But to the point. Admit it must be a general law, how is it possible it shall be equal and uniform throughout the State, so as to meet the wants of each county? The Legislature may, however, under the theory of this bill, impose taxes for the counties by general law, the same rate for all,

and then the result would be, that in one county there would be twice as much as was needed, and in another a large deficiency; but certainly it would be found, that such a law was precisely adapted to none or if any one only by accident. 'Is such a power as this in the hands of the Legislature? It may be said that the evils of such a measure will prevent its adoption. But this only appeals to the discretion of that body, but does not reach the question of power. The power is there if the theory of the law is sustained; it is only at the will of the Legislature whether it be exercised or not. But a step further. This law cannot be enforced in its principle to towns, as we have maintained. It operates only on sections, communities, districts, and may as well be extended over half the State, sub-dividing it into taxing districts. The same power that can form taxing districts out of territory that has been incorporated, but again, by repeal, resolved back into the body of the State, may be exercised over any other portion of our territory that has never been incorporated at all. This certainly cannot be denied. See the result that follows after this power. Districts may be laid off at the will of the Legislature, obnoxious sections or counties in times of party bitterness may be selected, and local governments established over them; their officers may be appointed by the Governor; they may be residents of other portions of the State; lucrative offices may be created, and liberal salaries provided, and we may have thus a very carnival of corruption in which the greedy partisan may revel and grow rich off of revenues

wrenched from the people, whose voice is not heard, or if heard not be heeded, for he is above them, irresponsible to them, but only to the power that appoints. Let such results, all of which are possibilities, but begun to be seen, and we shall have a glimpse only of the bitter results of departure from the old paths, the safe, recognized and established customs and institutions, the growth of the ages, fashioned and shaped by the wisdom of many generations, the ripened fruit of experience, gathered by our fathers' hands and handed down to their children as the priceless heritage of all the ages past. In view of all these considerations and many others that might be urged, I am imperatively bound to hold the powers conferred in this bill in violation of the Constitution and void.

The result would be, that the government of these or this district would fail for want of the vital element of revenue on which to live, and for want of officers to govern it. These being essential parts of the law inseparable from its other provisions, without this they would not have been enacted, the result will be to hold the whole law invalid, and of no effect whatever.

Several other grounds of objection appear to me probably fatal to its validity, but the ones discussed are the most important, and therefore have been made the basis of the discussion.

In conclusion, it is evident from the provisions of the bill itself, as well as from the well-known facts connected with its passage, that it was born of an

emergency, to meet the pressure of a particular case, therefore it is an abnormal conception, and its plan not adapted to the usual and ordinary state of things in the State, nor in harmony with the system of things grown up among us from the natural development of our social and political organism. To engraft such a measure in our system, is an experiment that I feel will be perilous in the extreme, am equally certain not authorized by the Constitution under which we live.

With this view, I can but hold it void. The demand of duty is imperative, must be met, let the consequences be what they may.